BALLENTINE MOTOR CO., INC., ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 83228–83230. Filed November 6, 1962.

---

[1] Proceedings of the following petitioners are consolidated herewith: Ballentine's, Docket No. 83229, and Ballentine Motors, Inc., Docket No. 83230.

*William L. Watkins, Esq.*, for the petitioners.
*George W. Calvert, Esq.*, for the respondent.

FORRESTER, *Judge:* Respondent has determined the following deficiencies in income tax of petitioners:

| Docket No. | Year | Petitioner | Deficiency |
|---|---|---|---|
| 83228 | 1952 1953 1954 | Ballentine Motor Co., Inc. | $7,510.02 3,581.91 20,797.84 |
| 83229 | 1954 | Ballentine's | 5,476.99 |
| 83230 | 1952 1954 | Ballentine Motors, Inc. | [2] (1,862.95) 5,088.90 |

Certain adjustments have been agreed to by all petitioners. The issues remaining for our consideration are (1) whether certain payments made by Commercial Credit Corporation to C. M. Ballentine constitute income to petitioners, and (2) whether certain income reported by another corporation should have been reported by petitioners in Docket Nos. 83228 and 83229.

#### FINDINGS OF FACT.

Some of the facts have been stipulated and are so found.

Ballentine Motor Co., Inc. (hereinafter referred to as Motor Co.), is a South Carolina corporation with its principal place of business in Columbia, South Carolina. It filed corporate income tax returns for the years in issue on an accrual basis with the director of internal revenue at Columbia, South Carolina.

Ballentine's is a South Carolina corporation with its principal place of business in Anderson, South Carolina. It filed corporate income tax returns on an accrual basis for the years in issue with the district director of internal revenue at Columbia, South Carolina.

Ballentine Motors, Inc. (hereinafter referred to as Motors), is a Georgia corporation with its principal place of business in Augusta, Georgia. It filed its 1954 corporate income tax return on an accrual basis with the district director of internal revenue at Atlanta, Georgia.

Ballentine Motors of Georgia, Inc. (hereinafter referred to as Georgia), is a Georgia corporation with its principal place of business in Atlanta, Georgia. It filed corporate income tax returns on an accrual basis for the years 1952 to 1956, inclusive, with the district director of internal revenue at Atlanta, Georgia.

During the period pertinent to these proceedings, C. M. Ballentine, an individual residing in Anderson, South Carolina, was president and controlling stockholder of all of the aforementioned corporations. He was also president of Motor Investment Company (hereinafter

---

[2] This overassessment was tentatively determined by respondent and is not in dispute herein.

referred to as Investment), a South Carolina corporation owned by him, members of his family, and his controlled corporations.[3]

C. M. Ballentine first entered the automobile business in Columbia in 1937. In 1939 he began a Ford dealership in Anderson, and in 1943 a Ford dealership in Greenwood, South Carolina. In 1946 he began a Lincoln-Mercury dealership in Anderson, under the name of Main Street Motors, later changed to Ballentine's , a petitioner herein. In 1950 he resigned the various franchises except the Lincoln-Mercury one which was sold, and became an independent dealer.

In 1949 he opened a lot in Columbia owned by Motor Co., adding another lot in that city later in the year. After terminating his Ford franchises, he opened a lot in Augusta operated through the corporation which had held the Ford franchise in Greenwood, Ballentine Motors, Incorporated. At a later date Motors was incorporated to conduct this business.

During their entire corporate existence Ballentine and his family owned all of the stock of each petitioner herein. The bookkeeping and accounting for all of the corporations was performed by Investment in a central office in Anderson.

Investment was organized in 1949 to finance the installment sales of automobiles by the various lots. It also kept the records of the other corporations and was compensated therefor by a percentage of sales from the lots.

On June 15, 1951, Investment sold its automobile finance paper to Commercial Credit Corporation (hereinafter referred to as C.C.C.), and agreed not to engage in the business of purchasing notes for 1 year.

Commencing in 1951, each corporation began selling the finance paper that it received on the credit sales of automobiles to C.C.C. under a contract referred to as a "Reserve Agreement." C. M. Ballentine negotiated and executed each agreement on behalf of each of the corporations.

Under these reserve agreements C.C.C. agreed to credit a portion of the carrying or finance charges on each note to a reserve account for such dealer. The unpaid portion of the price of the car itself was paid in full to the dealer by C.C.C. at the time it purchased the note. Initially, the amount of the carrying or finance charge that was credited to the reserve account for the dealer was determined through use of a percentage that varied depending upon the length of the period over which the car was being financed. However, the method of computation was later changed so that during the years 1952, 1953,

<hr>

[3] C. M. Ballentine also was president and controlling stockholder of Ballentine Motors, Incorporated; Ballentine Motor Company, Inc.; Ballentine & Crenshaw Motors; and Ballentine & Burson Motors, Inc., and controlling stockholder of Ballentine & McClelland Motors.

and 1954 the amount was computed at 25 percent of the carrying or finance charges.

Under either formula, the maximum credit that C.C.C. was willing to make to the reserve account of the dealer on its purchase of a note was $60 on maturities up to 18 months and $75 on maturities in excess of 18 months, even though the application of the percentage formula might result in a larger amount. These maximums, or "caps" were well established in the automobile financing industry in the years 1951, 1952, 1953, and 1954. A smaller percentage of the finance charges was allowed to smaller dealers and those that did not produce much business.

Under the "Reserve Agreement" with each dealer, C.C.C. agreed to pay to the dealer the amount in the reserve account that was in excess of 3 percent of the total outstanding balances on all notes purchased from the dealer, provided, however, that no payments need be made as long as the dealer was indebted to C.C.C. The amounts that were due to the dealer from the reserve account could be used to satisfy its indebtedness to C.C.C.

On May 19, 1952, C.C.C. and C.M. Ballentine entered into an agreement wherein C.C.C. agreed to pay C. M. Ballentine personally that part of 25 percent of the finance charge on each note sold to it by the petitioners (and his other dealer corporations) that was in excess of the $60 and $75 "caps" referred to above.

The May 19, 1952, agreement was the result of negotiations instituted by C.C.C. It was unwilling to pay the corporations more than the "caps" established in the industry for fear that other dealers would demand similar treatment. It therefore proposed payment to Ballentine individually of these extra amounts to keep the corporations' business and not disturb the rate it had to pay its other clientele for their finance paper. The various corporate dealers controlled by C. M. Ballentine were the largest single customers of C.C.C., providing almost 10 percent of its business for the Charlotte Division.

Ballentine would have been perfectly happy to have had C.C.C. pay the extra amounts directly to the corporations. He did no extra work because of these payments except to see that C.C.C. handled the financing of the sales by the various controlled corporations. Pertinent parts of said May 19, 1952, agreement were:

DEAR MR. BALLENTINE:

You are the owner, directly or indirectly through stock ownership, of each of the following automobile dealerships, hereinafter called "Dealer":

\* \* \* \* \* \* \*

Ballentine Motor Co. Inc.                                    \* \* \*

Ballentine Motors, Inc.                                       \* \* \*

Ballentine's                                                        \* \* \*

\* \* \* \* \* \* \*

You are also actively engaged in the management or supervision of the management of each Dealer.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

In consideration of, and in order to induce you to cause each Dealer named above to offer first to Commercial Credit for purchase all conditional sale contracts, chattel mortgages, lease agreements, promissory notes and other time sale obligations (all herein called "Instruments") arising from sales of new and used automobiles and trucks by such Dealer; and in further consideration of, and in order to induce you to cause the salesmen of each Dealer named above to promote time sales, thereby increasing the Instruments offered to Commercial Credit by such Dealer, Commercial Credit hereby agrees to set up for your personal account such sums as may be agreed upon between yourself and Commercial Credit from time to time, based upon the Instruments purchased from each Dealer by Commercial Credit, and as set forth in statements rendered to you monthly by Commercial Credit.

On December 1st of each year that this Agreement remains in effect, Commercial Credit will pay to you the amounts held by it for your personal account &ast; &ast; &ast;

The following amounts were received by Ballentine as finance reserve rebates with respect to contracts originated by Motor Co., Ballentine's, and Motors:

| Corporation | 1952 | 1953 | 1954 | Total |
|---|---|---|---|---|
| Motor Co | $8,274.98 | $8,851.71 | $4,534.84 | $21,661.53 |
| Ballentine's | 1,845.23 | 897.72 | 0.00 | 2,742.95 |
| Motors | 9,518.60 | 4,797.75 | 2,751.17 | 17,067.52 |
| | | | | 41,742.00 |

These amounts were paid directly by C.C.C. to C. M. Ballentine, reported in the joint income tax returns of C. M. Ballentine and his wife, as ordinary income received, and income tax on the same was paid by him. The highest bracket at which the income for such years was taxed was as follows:

| Year | Percent |
|---|---|
| 1952 | 66 |
| 1953 | 48 |
| 1954 | 38 |

Respondent determined that these amounts represented income earned by petitioners that should be taxed to the corporation with respect to whose contracts the payments were made.

Georgia operated a used car lot in Atlanta, Georgia, which lot was an unprofitable venture from its inception in 1951. Its paid-in capital was $25,000 at all times herein relevant. As of December 31, 1953, it had an operating deficit of $59,919.97, resulting from operating losses in 1951, 1952, and 1953.

Early in 1954 C. M. Ballentine considered means to enable Georgia to become profitable. At that time Georgia owed approximately $60,-000 to Investment. He decided to expand Georgia's activities to encompass the Anderson lot of Ballentine's and the Columbia lots of Motor Co. with the plan to remove the latter two entities into some

other line of business. Pursuant to this plan Georgia became domesticated in the State of South Carolina on May 6, 1954.

On May 10, 1954, Georgia acquired from Ballentine's its entire inventory of automobiles located on a lot in Anderson, South Carolina. The book value of this inventory was $54,367.31. The transaction was closed in Anderson, South Carolina, by a simultaneous exchange of checks. Ballentine's owed Investment $6,000 on May 10, 1954, and on that date, Investment made a loan to Georgia by a check for $70,000 deposited to the account of the latter in Carolina National Bank at Anderson. On the same day Georgia issued its check to Ballentine's in the amount of $54,367.31 and this was deposited to the account of Ballentine's in the same bank. On the same date, Ballentine's issued its check to Investment for $82,500 which was deposited to the account of Investment in the same bank and credited to Ballentine's account on the books of Investment.

No change was made in the operating personnel of the Anderson lot or its management on account of the transaction of May 10, 1954. This lot was thereafter, until January 1, 1955, treated on the books of Georgia as its own and the net profits therefrom derived are the profits which respondent is attempting in this case to tax to Ballentine's in 1954.

On June 15, 1954, Georgia acquired from Motor Co. its entire inventory of automobiles located on two lots in Columbia, South Carolina. The book value of this inventory was $130,056.71. The transaction was closed in Anderson, South Carolina, by a simultaneous exchange of checks. Motor Co. owed Investment $46,400 at the time (June 15, 1954). On that date, Investment made a loan to Georgia by checks deposited to the account of the latter in Carolina National Bank at Anderson in the amount of $126,000. On the same date Georgia issued two checks to Motor Co. in the aggregate amount of $130,056.71 and these were deposited to the account of Motor Co. in the same bank. On the same date Motor Co. issued two checks to Investment for an aggregate amount of $130,000 and these were deposited to the account of Investment in the same bank and credited to the account of Motor Co. in the books of Investment.

No change was made in the operating personnel of the Columbia lots or their management on account of the transaction of June 15, 1954. These lots were thereafter, until January 1, 1955, treated on the books of Georgia as its own, and the net profits therefrom derived are the profits which respondent is attempting in this case to tax to Motor Co. in 1954.

The amounts paid for the respective inventories on the above three lots were in each case at least equal to the fair market values of such inventories.

Bills of sale for cars sold at the Anderson and Columbia lots after May 10, 1954, and June 15, 1954, respectively, were executed in the name of Georgia. Separate ledger sheets were set up to record the transactions of the three separate lots. Expenses incurred at the lots after such dates were paid by checks of Georgia.

Employees of the Anderson lot received two Forms W–2 in 1954, one indicating that their employer up to May 10, 1954, was Ballentine's and the other indicating that their employer after May 10, 1954, was Georgia. Employees of the Columbia lots each received two Forms W–2, indicating that prior to June 15, 1954, they were employed by Motor Co. and that subsequent to that date, they were employed by Georgia.

At the time of the transactions referred to the two lots of Motor Co. in Columbia had office buildings on them that cost a total of about $6,000 or $8,000. The lot of Ballentine's at Anderson had an office building and other leasehold improvements that cost in excess of $18,000 and furniture and fixtures that cost about $4,000. Each lot also had wash racks and other machinery and equipment. Nothing was paid to Ballentine's or to Motor Co. for these leasehold improvements or other fixtures or equipment on the three South Carolina lots which were transferred to Georgia on May 10, 1954, and June 15, 1954. Ballentine's and Motor Co. continued to claim depreciation and amortization on the assets throughout the year 1954.

The leases under which Ballentine's and Motor Co. occupied the car lots in Anderson and Columbia were not transferred to Georgia, but Georgia paid the rent on these lots after the purchase of the respective used car inventories.

At the end of 1954 the inventory on the Anderson lot was transferred to Ballentine & McClelland Motors. The lots in Columbia were operated on and after January 1, 1955, by Ballentine Motors, Incorporated, which had formerly operated the Ford franchise at Greenwood. After January 1, 1955, Georgia continued (for an undisclosed length of time) to operate its original lot in Atlanta at a profit and then it was closed out, but the record is silent as to any exact details.

On August 1, 1955, Motor Co., Ballentine's, and some of C. M. Ballentine's other corporations were merged, but more exact information is not in the record. The successor corporation engaged in some phase of the automobile business for a "very short while" and thereafter "engaged in stock and commodity trading."

Georgia reported in its 1954 corporate tax return the net income, in the amount of $65,647.34, from the Anderson and Columbia lots earned after it had purchased the inventories of those lots and offset all but $5,727.37 of this income against its prior operating losses of $59,919.97.

OPINION.

## Issue 1.

The first issue to be resolved is whether petitioners or C. M. Ballentine earned the extra payments made to him by C.C.C. pursuant to the May 19, 1952, contract. Petitioners argue that Ballentine promised to deliver the finance business of his various corporations to C.C.C. in return for the payments, and that he, individually, earned them. Respondent contends that the petitioner-corporations earned these by contracting to sell the financing contracts of their installment sales, and that C. M. Ballentine was acting on behalf of the petitioners in contracting for these extra rebates.

Respondent's argument is supported by *United Dressed Beef Co.*, 23 T.C. 879 (1955), and *Union Stock Farms* v. *Commissioner*, 265 F. 2d 712 (C.A. 9, 1959), affirming on this issue a Memorandum Opinion of this Court. These cases involved overceiling payments for meat to employees and shareholders of the corporations selling the meat. In *United Dressed Beef Co.* we said (pp. 885–886):

The meat sold was owned by the corporation and the amounts collected were measured by the pounds of meat sold to customers of the corporation. The exaction of the payments was possible because of the scarcity of meat and the willingness of buyers to pay more than the fixed prices. These amounts do not resemble tips to a minor employee, for no additional services were rendered as consideration for them and the responsible officers of the corporation directed these collections. On these facts we have found that the overceiling collections were made by the corporation. * * *

In *Union Stock Farms* v. *Commissioner, supra*, the Ninth Circuit agreed, and rejected contentions that (1) the corporation never received the illegal payments, and (2) the corporation had no control over the payments. It stressed the closely-held nature of the corporation, the fact that the recipients did no more to earn the illegal payments than they did to receive the allowable payments, and that the corporate officers acted in their corporate capacities.

We find these cases apposite here. C. M. Ballentine did nothing to earn the extra rebates other than what he did to enable the petitioners to earn their "caps." The payments to him were made because of the activity of petitioners in giving C.C.C. their installment paper, and C. M. Ballentine was acting in an agency capacity for his corporations in securing extra rebates for them. *Union Stock Farms* v. *Commissioner, supra*.[4] The extra payments were made because of the

---

[4] C. M. Ballentine testified as follows:

"Q. You executed this agreement of May 19, 1952, which is Exhibit 1, with Commercial Credit Corporation, where they agreed to pay you personally a portion of the finance charges. Now did that agreement require you to perform any additional services that you hadn't already been performing?

volume of business provided by the corporations, and their sales earned these extra rebates.

Petitioners rely on cases where the president of corporations selling automobiles operated (1) an insurance business [5] and (2) a finance business,[6] the customers of which, in each case, were the buyers of automobiles from the dealer corporations. These cases disapproved respondent's efforts to tax all of the income to the dealer corporations because of findings that the insurance business (in the former case) and the financing company (in the latter case) were subsisting separate entities. These cases are inapposite to the instant case.

We conclude that the disputed payments were earned by and taxable to petitioners. To hold otherwise would be to put C. M. Ballentine on the horns of the unfortunate dilemma of either having accepted "side" payments for performing in derogation of the best interests of his corporations, or of having accepted money due them because of his efforts as their agent and employee.

Petitioners argue that there was no tax avoidance since C. M. Ballentine paid taxes on the payments at rates generally higher than those of petitioners. This, if true, has no significance, but we observe that since petitioners earned this income and permitted C. M. Ballentine to retain it, it is ordinary income taxable to them and a corporate distribution to him which may possibly constitute a taxable dividend.

## Issue 2.

Respondent has allocated the net income from the sale of the inventories on the Columbia and Anderson lots (after the transfer of these inventories to Georgia) to the transferor corporations, to wit, the petitioners in Docket Nos. 83228 and 83229. In the notices of deficiency he relied upon sections 61 and 482 of the Internal Revenue

---

A. No, sir; nothing other than to see that they got the business.

Q. Well, you were already doing that under the corporations' contracts with the finance company, were you not, as President?

A. That's right; I agreed to do that for a period of a year. That was from 1951, I believe, May of 1951.

* * * * * * *

Q. Well, you were protecting the interests of your corporations, were you not?

A. Yes, sir.

Q. You would have been perfectly happy for your corporations to have received this money direct would you not?

A. I certainly would have. It wouldn't have made any difference to me, but Commercial Credit wouldn't pay it on that basis. They did not want to upset the pattern that was in force with the various finance companies over the country.

Q. In other words, what you are saying is that you would do the same amount of work with this amount being paid to you personally as you would have done if the additional amount had been paid to the corporations themselves?

A. Yes, sir. I don't think there was any change in the setup at all, except that I simply agreed to see that Commercial Credit Company got the business. * * *"

[5] *Moke Epstein, Inc.,* 29 T.C. 1005 (1958).

[6] *Raymond Pearson Motor Co.* v. *Commissioner,* 246 F. 2d 509 (C.A. 5, 1957), reversing a Memorandum Opinion of this Court.

Code of 1954,[7] contending that the transactions were unreal and that his allocations are necessary to prevent tax evasion and to clearly reflect income.

The purpose of section 482 is to prevent the evasion of taxes by the shifting of profits, the making of fictitious sales, and other methods usually used to "milk" a taxable entity. H. Rept. No. 2, 70th Cong., 1st Sess., pp. 16–17 (1928), 1939–1 C.B. (Part 2) 395; S. Rept. No. 960, 70th Cong., 1st Sess., p. 24 (1928), 39–1 C.B. (Part 2) 426. However, taxpayers owned or controlled by the same interests may enter into transactions *inter se* and if fair, or resulting from arm's-length bargaining, such transactions will be undisturbed. E.g., *Davis* v. *United States*, 282 F. 2d 623 (C.A. 10, 1960).

The Commissioner has been given much latitude in his use of section 482. In *National Securities Corp.* v. *Commissioner*, 137 F. 2d 600 (C.A. 3, 1943), affirming 46 B.T.A. 562, a parent with a greatly depreciated security transferred it to a wholly owned subsidiary which attempted to take the loss. In sustaining the allocation of the loss to the parent, the Third Circuit said (p. 602):

By Section 45 Congress has conferred authority upon the Commissioner to allocate deductions "if he determines" that such allocation "is necessary." This is a broad discretion, limited only in that the necessity must arise "in order to prevent evasion of taxes or clearly to reflect the income." *G.U.R. Co.* v. *Commissioner*, 7 Cir., 1941, 117 F. 2d 187.

At the threshold we are confronted by authorities stating that the Commissioner has no authority under the predecessor of section 482 to allocate net income. *Chelsea Products, Inc.*, 16 T.C. 840 (1951), affd. 197 F. 2d 620 (C.A. 3, 1952); *T.V.D. Co.*, 27 T.C. 879 (1957).

In *Chelsea Products* taxpayer established wholly owned subsidiaries purportedly to conduct its sales activities. The Commissioner allocated the net income of these subsidiaries to the taxpayer. We found that the subsidiaries were separate enterprises formed principally to carry on business, and the Third Circuit affirmed. It stated the governing principles as follows (197 F. 2d 623):

Both the Treasury Regulation and the Committee Report clearly delineate the scope of Section 45. This section authorizes the Commissioner to scrutinize all transactions between controlled corporations. His object is to arrive at the

---

[7] SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, * * *

SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

*true net income* of each controlled taxpayer and the technique used is the application of the standard of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. Whenever the lack of an arm's length relationship produces a different economic result from that which would ensue in the case of two uncontrolled taxpayers dealing at arm's length, the Commissioner is authorized to allocate gross income and deductions. [Emphasis supplied.]

Although recognizing that the statutory purpose was to arrive at true net income, the court denied the use of section 45 of the 1939 Code because (1) the notices of deficiency did not properly raise the issue, and (2) the Commissioner had allocated net income so as to, in effect, produce a result equivalent to the filing of a consolidated return,[8] citing section 29.45–1(b), Regs. 111, and the committee reports cited above.[9]

*T.V.D. Co., supra,* involved the sale of a profitable concern to one in dire straits. We held that there was a bona fide sale for legitimate purposes and that section 45 was not intended to apply to such transactions. We added gratuitously that the Commissioner had allocated "net profit" or "net amount," which he could not do under section 45, citing *Chelsea Products, Inc., supra.*

We believe that net income may in certain instances be properly allocated under section 45 and currently section 482. If net profits are shifted (one device at which the statute was specifically directed), it would be a logical short cut to allocate them instead of allocating "gross income, deductions, credits, [etc.]." The other devices of income shifting mentioned by the committee reports similarly suggest allocation of such income. The statute allows allocation of gross income and deductions, and to the extent this is permitted we believe it may be done as "net income."

---

[8] This view is not shared by the Second Circuit. In *Advance Machinery Exch.* v. *Commissioner,* 196 F. 2d 1006 (C.A. 2, 1952), affirming a Memorandum Opinion of this Court, certiorari denied 344 U.S. 835, it was specifically held that accomplishing the result of filing a consolidated return by income shifting was the type of tax evasion which prompted the enactment of the predecessor of section 482. Judge Biggs of the Third Circuit sat on this case.

In *Commissioner* v. *Chelsea Products,* 197 F. 2d 620, the Third Circuit (Judge Biggs not sitting) distinguished *Advance Machinery Exch.* as dicta. Yet the Second Circuit had said (pp. 1008–1009) : "We need not decide whether what the Commissioner did is sustainable under § 22(a), I.R.C. alone, * * * since we think § 45 is applicable to this situation despite the petitioner's contention that what the Commissioner has done amounts to a consolidation of the income of the various entities as under § 141(d), I.R.C. * * *."

The related corporations in the instant case lacked a common parent and hence could not file a consolidated return. Sec. 1504. We therefore need not decide whether to follow *Chelsea Products* or *Advance Machinery Exch.* However, we do feel that the Third Circuit in *Chelsea Products* rested on the legitimate business purposes of the sales corporations and the improper manner in which the Commissioner proceeded. There is no element of surprise in the instant proceeding, and lack of business purpose is discussed, *ante.*

[9] Five judges dissented from the Tax Court opinion on the ground that allocating net income is a shorthand method of allocating both gross income and deductions attributable thereto. This argument was summarily dismissed by the appellate court without citations.

We do not construe *Chelsea Products, Inc.,* or *T.V.D. Co.* to prevent this type of allocation. In *Chelsea Products, Inc.,* and in *T.V.D. Co.,* both *supra,* respondent's principal arguments were that the income was earned by sham corporations, and in each case this argument was rejected on the facts.[10] Here he is contending that income was shifted to a valid and subsisting corporation but that the transfer was to evade taxes and resulted in a distortion of income.[11]

Petitioners point to the fact that book value (which in this case was at least equal to fair market value) was paid for the inventories, as evidence that the economic result was the same as if the transactions had been at arm's length. *Davis v. United States, supra.*

Petitioners rely on language in *T.V.D. Co., supra,* that (p. 885):

it must be remembered that while Enterprise had available loss carryovers at the time it took over petitioner's business, it did not at that time or by virtue of that transaction take over any profits from petitioner or have any guarantee that the soap business would from then on produce profits which would result in any tax savings to anyone. In other words, Enterprise took over a business that had in the past been profitable. It did not take over any profits of that business already earned. And for all that appears of record, whether the business would continue profitable after the takeover was anybody's guess. In these circumstances section 45 has no application. * * *

We agree that if the sales of inventory in the instant case had been bona fide, then petitioners must prevail on this issue.

Respondent emphasizes (1) that another controlled corporation financed the purchases of inventory, (2) that after the close of Georgia's taxable year (when its operating loss carryover had been

---

[10] In *Chelsea Products, Inc.,* we said (p. 851): "the Commissioner has not distributed, apportioned or allocated gross income, deductions, credits, or allowances between or among such trades or businesses as contemplated by the statute where section 45 is to be applied." The deficiency notice read (16 T.C. 841):

"(a), (b) and (c) It has been determined that the amounts of $13,936.08, $13,531.80 and $14,221.80, alleged to represent net income of Chelsea Fan & Blower Co., Inc., Chelsea Fan and Blower Company of Georgia and Chelsea Fan and Blower Company of Missouri, respectively, represent net income taxable to you for the taxable year 1944."

The result there was to assign *all* of the net income of the three other taxpayers to the petitioner therein, as an alternative to respondent's primary argument that the former corporations were shams. We rejected this alternative since it in reality was also based on the theory of disregarding the corporate existence of the three corporations. Thus the Third Circuit holding, *supra,* is to the same effect. That court disapproved the action of the Commissioner in "disregarding the corporate entities of the sales companies." (197 F. 2d at p. 623.)

In *T.V.D. Co.,* 27 T.C. 879, 884–5 (1957), we relied on *Chelsea Products* to disapprove allocating net income, and then held (at p. 885) that "the Commissioner's action in allocating the soap profits realized during the period in question * * * entirely ignores the existence of Enterprise as a corporate entity. Enterprise was no sham."

See also *Campbell County State Bank, Inc.,* 37 T.C. 430, on appeal (C.A. 8).

[11] For an illustration of the principle that "sham" corporations are disregarded for tax purposes without reallocation of income and that the latter concept applies only to entities which are not shams, see *Haberman Farms, Inc. v. United States,* 305 F. 2d 787 (C.A. 8, 1962).

offset by current income) the inventory w as transferred to other controlled corporations, (3) that only on Georgia's books was the sale evident, and (4) that therefore the sole purpose of the sale was to make use of Georgia's net operating loss carryover. We have concluded from the facts that the sole purpose of the sale was to make use of Georgia's net operating loss carryover, and that therefore respondent's action was proper.

Petitioners' president testified as follows:

Q. Well, did they [the inventories] have some potential profit tied up in them?

A. Yes, sir. They always have some potential profit; I mean, any car that we have in our inventory certainly has some potential profit.

Q. Now is it not true, you wanted to get that potential profit into the hands of Ballentine Motors of Georgia, Inc., to wipe out their deficit?

A. Well, yes, I was trying to get some profit into Ballentine Motors of Georgia. I was trying to keep it from going into bankruptcy, if I could do it.

Q. You felt there was profit in those unsold cars in those three lots in South Carolina?

A. Yes, sir. * * *

We are unable to conclude that respondent has exceeded his authority in applying section 482. Although it is true that Georgia might not have made a profit from the inventories of the South Carolina lots, the *temporary* shift in the title to the income-producing assets seems to be but a flagrant attempt to make use of Georgia's net operating loss carryover. This was something that Georgia had demonstrated no ability to do on its own. The otherwise unexplained retransfer of these inventories on January 1, 1955, can only indicate that the overall plan from the beginning had been an arbitrary shifting of income among controlled businesses.[12]

Petitioners also argue that no profits were shifted at the time of the sales of inventory and that therefore section 482 does not apply. *T.V.D. Co.*, *supra*. Apparently their contention is that a scheme to evade taxes by profit shifting will be sustained if income-producing property is transferred to a loss corporation until the loss carryover is used up and then transferred to other controlled corporations, as long as no previously earned profits as such are transferred.

We read *T.V.D. Co.* as resting on a finding that a tax avoidance scheme was not the primary motive of the transactions, and as standing for a "business purpose" test, and as not in conflict with our holding here.

We find, in view of all the surrounding circumstances, that the primary purpose of the sales of inventory in the instant case was tax

---

[12] We note that if all of the corporations had merged, it is highly questionable whether the income from the lots in South Carolina could be offset by Georgia's net operating loss carryover. See *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382 (1957).

avoidance. The reason proffered—that the purpose was to prevent the liquidation of Georgia and to get it on its feet—is belied by the record. The profitable inventories were taken away from Georgia on January 1, 1955, as soon as its net operating loss carryover had been exhausted, and it was then in its pretransfer economic position, since its profit-making assets were gone.

The substance of this entire transaction was that profit which would otherwise have gone to petitioners was received by Georgia as long as it could be offset by Georgia's net operating loss carryforward, and no longer. Georgia used the established business of petitioners in South Carolina to sell the automobiles. These business enterprises earned the income in question. Their facilities were used. Their business reputations were used. All Georgia did was procure title to the inventory. We find this to be the type of tax evasion which Congress sought to remedy by enacting the predecessor of section 482. S. Rept. No. 960, *supra*.

We therefore hold that when, as here, assets from which income is expected are transferred from one business to another business (both controlled by the same interests) and the *primary* object of the transfer is tax evasion by the shifting of anticipated profits, as it was here, that section 482 is not rendered inapplicable merely because the profits to be shifted have not yet been realized.

Reviewed by the Court.

*Decisions will be entered for the respondent.*

---

OPPER, *J.*, concurring: As nearly as I can determine, respondent did here exactly what was done in *Chelsea Products, Inc.*, 16 T.C. 840 (1951), aff'd. 197 F. 2d 620 (C.A. 3, 1952), and *Advance Machinery Exch.* v. *Commissioner*, 196 F. 2d 1006 (C.A. 2, 1952), affirming a Memorandum Opinion of this Court, certiorari denied 344 U.S. 835 (1952); that is, he taxed to Ballentine's for the year 1954 the "net profits" of the "Anderson lot" reported by Georgia. Similar action was taken as to the "Columbia lots," and Motor Co. He did not first allocate "gross income" with or without taking into consideration the allocation of any deductions, but used the "net income" approach as a direct route to the same destination.

We are saying here that this is permissible under section 45. While this seems to me inconsistent with our statement in the *Chelsea Products* case, I think we were wrong in *Chelsea Products* and I, accordingly, agree with the present opinion. See also *Aldon Homes, Inc.*, 33 T.C. 582, 607 (1959), (concurring opinion).

TIETJENS, *J.*, agrees with this concurring opinion.