OPINION Raum, Judge: 1. The Commissioner relies on sections 61 (a) and 482 in his determination that the net income of all the petitioners in the taxable years is taxable to New York. For the reasons set forth in the accompanying footnote, we consider only section 482,[2] which provides as follows: SEO. 482. ALLOCATION OP INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. We discussed certain aspects of section 482 in Pauline W. Ach, 42 T.C. 114, 125-126, affirmed 358 F. 2d 342 (C.A. 6), certiorari denied 385 U.S. 899: Section 482 is remedial in character. It is couched in broad, comprehensive terms, and we should be slow to give it a narrow, inhospitable reading that fails to achieve the end that the legislature plainly had in view. ⅜ * ⅜ * * * * * * * Respondent may allocate income under section 482 in order to prevent “evasion of taxes or clearly to reflect the income.” The legislative history of section 482 indicates that it was designed to prevent evasion of taxes by the arbitrary shifting of profits, the making of fictitious sales, and other such methods used to “milk” a taxable entity, Ballentine Motor Co., Inc., 39 T.C. 348, affirmed 321 F. 2d 796 (C.A. 4) ; Seminole Flavor Co., 4 T.C. 1215, 1228. The Commissioner has considerable discretion in applying this section and his determinations must be sustained unless he has abused his discretion. We may reverse his determinations only where the taxpayer proves them to be unreasonable, arbitrary, or capricious. See, e.g., G.U.R. Co. v. Commissioner, 117 F. 2d 187, 189 (C.A. 7); National Securities Corp., 46 B.T.A. 562, 564, affirmed 137 F. 2d 600, 602 (C.A. 3), certiorari denied 320 U.S. 794; Grenada Industries, Inc., 17 T.C. 231, 255, affirmed 202 F. 2d 873 (C.A. 5), certiorari denied 346 U.S. 819. ⅜ ⅜ ⅜ See also Grenada Industries, Inc., 17 T.C. 231, 255. The Commissioner in this case has relied on section 482 “clearly to reflect the income” of petitioners. He does not claim that the reallocation was necessary “to prevent evasion of taxes.” That the allocation of net income is proper has now been firmly established. See, e.g., Pauline W. Ach, 42 T.C. at 126; Hamburgers York Road, Inc., 41 T.C. 821, 824; Ballentine Motor Co., 39 T.C. 348, 357, affirmed 321 F. 2d 796 (C.A. 4). In discussing the application of section 482 to this case, it is helpful to divide the petitioners whose reported income was allocated to New York into two groups. The first group, which we will call the foreign sales corporations, consists of Export, Pan-American, International, Trans-America, and Phibro. We hold that the Commissioner’s determination with regard to these petitioners must be sustained. Petitioners apparently assume that section 482 cannot be applied to corporations formed for a valid business purpose, a plainly untenable position, for even if a corporate entity may not otherwise be disregarded, the question still remains whether income actually earned by one corporation has been artificially deflected to another under common control, and it is in precisely such circumstances that the Commissioner is authorized to make a reallocation under section 482 in order to reflect income clearly. Grenada Industries, Inc., 17 T.C. at 252-253; Local Finance Corp., 48 T.C. 773, 792. Petitioners have introduced no evidence to show that the foreign sales corporations, rather than New York, actually earned the income reported on their returns. The record in this respect is woefully deficient. On their tax returns for the years involved, none of these corporations reported any deductions for salaries or wages. There is no indication that any of them had any employees. It is undisputed that all bookkeeping and shipping arrangements were made in the office of New York, and that buyers’ orders were processed in the same office. The only deductions on the returns of the foreign sales corporations were for contributions, taxes, minimal amounts for office, legal, and accounting expenses, and special deductions in the case of the Western Hemisphere trade corporations. A corporation can carry on business only through agents, and petitioners have not shown in the case of these corporations that there were any agents actually producing the reported income. Cf. Griffin & Co. v. United States, 389 F. 2d 802 (Ct. Cl.). While these corporations may have been formed for valid business purposes, petitioners have not shown that during the years at issue the corporations themselves in fact carried on any business activities. The record in this case is quite vague concerning the mechanics of the chemical sales involved, and we conclude that petitioners have failed to sustain their burden of proving erroneous the Commissioner’s determination that the income reported for the years in question by Export, Pan-American, International, Trans-America, and Phibro was actually earned by New York. In light of our conclusions here it is unnecessary to deal with the Commissioner’s alternative contention that Export’s surtax exemption for its taxable years ending November 30,1960, and November 30,1962, should be disallowed under section 269. The Commissioner’s allocation of the net income of Massachusetts, Pennsylvania, Maryland, Connecticut, and Ehode Island (which we will call the domestic sales corporations) to New York presents different problems. Although we are again hampered by an unsatisfactory record, we think that enough has been shown to establish that the Commissioner’s allocation of all the net income is arbitrary and erroneous and that there is no basis for any reallocations. The tax returns of the domestic sales corporations in evidence (whose figures are not disputed) reveal that, in sharp contrast to the foreign sales corporations, the domestic corporations did themselves carry on substantial activities, which produced the income reported on the returns. Massachusetts maintained an office and employees, including salesmen. Our findings show that with gross profits of $173,775.20, $159,446.49, and $168,874.44, respectively, for the years indicated, Massachusetts paid around $100,000 each year in wages and salaries, as well as substantial amounts for rent, salesmen’s expenses, telephone, insurance, postage, and other office expenses. It maintained substantial inventories in each year. The only activities related to the earning of Massachusetts’ income that appear to have been performed by New York were bookkeeping and traffic functions. We have no reason to conclude that these functions were other than purely routine or that New York played any significant part in generating tire business of Massachusetts. Massachusetts paid New York $15,000 for such services (as well as for similar services to Connecticut and Rhode Island) ; such amount appears to have been adequate. Rhode Island and Connecticut may be treated together. Each maintained offices[3] and employees, including salesmen. Rhode Island, with gross profits of $136,415.29, $136,982.66, and $156,389.29, respectively, for the 3 years indicated in our findings, paid between $48,000 and $73,000 each year in salaries. Connecticut with gross profits of $128,010.21, $116,369.43, and $128,645.83 for its 3 indicated years, paid between $47,000 and $60,000 in salaries. Each corporation further deducted substantial amounts for such items as salesmen’s expenses, stationery and printing, telephone, insurance, postage, and legal and accounting fees. Each corporation maintained a substantial inventory. The only efforts of New York that appear to have contributed to the earnings of Connecticut and Rhode Island were bookkeeping and traffic functions. Connecticut and Rhode Island each paid Massachusetts $24,000 per year for services rendered, and undoubtedly some of these payments were to reimburse Massachusetts for money paid to New York for services rendered by New York to Connecticut and Rhode Island.[4] Pennsylvania and Maryland may also be treated together. It is important to note at the outset that their business differed from the New England companies in that fewer orders but larger volumes were involved. Both Pennsylvania and Maryland maintained small offices and some employees. While it is not clear whether either had its “own” salesmen, each deducted sums for “salesmen’s expenses” on the returns before us. Pennsylvania, with gross profits as indicated for the years in our findings of $52,081.27, $50,212.55, and $76,350.42 deducted salaries in those years in amounts from around $16,000 to $43,000. Maryland, with gross profits of $38,797.66, $31,392.82, and $74,398.45, deducted salaries from around $19,700 to $40,000. Both corporations maintained substantial inventories for at least some years. While New York clearly performed office functions for the two corporations, they each paid New York $2,400 per year for such services. That this amount is lower than that paid by the New England companies is explained by the differences in the nature of the business as set forth above. In short, the record discloses no basis for concluding that any of the income reported by the domestic sales corporations should be reallocated to New York; to the contrary, it indicates that these corporations earned their own income, New York having been compensated for any services it performed. It does seem coincidental that the taxable income for each of the domestic sales corporations on all of the returns before us was very close to $25,000. It does not necessarily follow, however, that these corporations were reporting net income actually earned by New York. For instance, it may be that officers’ salaries were manipulated or inflated in some years. Such an issue is, of course, not before us. 2. The remaining issue is whether the Commissioner’s determination with respect to New York’s taxable year ending June 30, 1961, was barred by limitations. It is undisputed that the usual 3-year period of limitations of section 6501(a) had expired, but the Government relies upon the 6-year period of section 6501(e) which applies when there is an omission of gross income in excess of 25 percent of the amount reported on the return.[5] If the 6-year period is applicable, there is no question that the Commissioner’s action was timely. The burden of proof as to the existence of the 25-percent omission is upon the Commissioner. Gaylor C. Peters, 51 T.C. 226, 230; Nadine I. Davenport, 48 T.C. 921, 921-928; C. A. Reis, 1 T.C. 9, affirmed 142 F. 2d 900 (C.A. 6). The income claimed to have been omitted is the reallocated income from the other petitioners. New York argues that since all the gross income was reported by the petitioners taken as a group, it cannot be said that such income was “omitted.” (But see, Pauline W. Ach, 42 T.C. at 127, fn. 2). We need not pass upon this point here because we conclude that the Commissioner has not proved that the 25-per-cent requirement was met in any event. In the case of a trade or business, “gross income” as used in section 6501(e)(1) means gross receipts without any reduction for cost of goods sold. Sec. 6501(e) (1) (A) (i). New York’s income tax return for the year ending June 30,1961, reported “gross receipts” of $8,906-893.60 and “other income-commissions earned” of $988.50, or a total gross income for section 6501 (e) (1) purposes of $3,907,882.10. Twenty-five percent of this figure is $976,970.53. In our conclusions above, we have sustained the Commissioner’s allocation to New York of the net income of the foreign sales corporations, but not of that of the domestic sales corporations. The Commissioner, however, has failed to supply us with figures showing the gross income of the foreign sales corporations for the year ending June 30, 1961, and the burden of doing so was upon him. The deficiency notice to New York contains only net income amounts with adjustments for certain intercorporate charges. We may note, however, that the total gross income of the five foreign sales corporations reported on their returns for taxable years ending-in 1961 (four on March 31 and one on November 30) is $805,719.31, which is around 21 percent of New York’s reported gross income for the year ending June 30,1961. We hold, therefore, that the deficiency for the year ending June 30, 1961, with respect to New York is barred by limitations. Decisions will he entered under Bule 50 in docket Nos. 1317-67,1337-67,1338-67,1339-67, 1340-67, and 1359-67. Decisions will he entered for petitioners in docket Nos. 1314-67, 1315-67, 1316-67, 1360-67, and 1361-67. It is clear that sec. 61(a) allows the Commissioner to charge income to whoever actually earns it. See, e.g., Lucas v. Earl, 281 U.S. 111; Griffiths v. Commissioner, 308 U.S. 355; Helvering v. Eubank, 311 U.S. 122; Commissioner v. Sunnen, 333 U.S. 591. But as we said in Grenada Industries, Inc., 17 T.C. 231, 253, affirmed 202 F. 2d 873 (C.A. 5), certiorari denied 346 U.S. 819 (speaking of predecessor sections), in the case of organizations under common control, sec. 482 explicitly authorizes the Commissioner to reallocate items in order clearly to reflect the income of each organization and thus to charge the income to the organization that earned it; to the extent that sec. 482 is applicable, therefore, sec. 61(a) adds nothing of strength to the Commissioner’s position here. See also Local Finance Corp., 48 T.C. 773, 783-789, affirmed 407 P. 2d 629 (C.A. 7, 1969). While Connecticut aid not deduct any amounts for rent on the returns before us, it was undisputed that it did maintain an office. The question of a possible reallocation between Rhode Island, Connecticut, and Massachusetts is not before us. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. — Except as otherwise provides in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed * * * * * * * * * * (e) Substantial Omission of Items. — Except as otherwise provided in subsection (c)— (1) Income taxes. — -In the ease of any tax imposed by subtitle A— (A) General rule. — If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment at any time within 6 years after the return was filed. For purposes of this subparagraph— (i) In the case of a trade or business, the term “gross income” means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services ; * * *