T.C. Memo. 2012-166

UNITED STATES TAX COURT

KEVIN H. LOVE AND RONDA J. LOVE, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.  5999-09,  6000-09,        Filed June 13, 2012.
             6290-09,  6303-09,
             6449-09, 12128-09.

        Held:  On the evidence before us, Ps' acquisition of stock in an
S corporation did not occur for the principal purpose of evading or
avoiding income tax by obtaining the benefit of a deduction to which
Ps would not otherwise have been entitled.  See I.R.C. sec. 269.

───────────────────

        [1]Cases of the following petitioners are consolidated herewith:  G. Steven and
Carrie J. Neff, docket No. 6000-09; Todd R. and Andrea Pedersen, docket No.
6290-09; Keith and Melisa Nellesen, docket No. 6303-09; Bradley T. and Terri
Jensen, docket No. 6449-09; and Mark McKay and Christine A. Beck-McKay,
docket No. 12128-09.  An additional issue tried in docket Nos. 6000-09 and 6449-
09 regarding split-dollar life insurance will be the subject of a separate opinion.

W. Waldan Lloyd, David R. York, and Daniel S. Daines, for petitioners.

Charles B. Burnett and Milan H. Kim, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, Judge:  In these consolidated cases respondent determined deficiencies in petitioners' 2004 joint Federal income taxes plus accuracy-related penalties under section 6662[2] as follows:

| Petitioners | Deficiency | Penalty Sec. 6662 |
|---|---|---|
| McKays | $1,249,848 | $214,786 |
| Pedersens | 1,204,920 | 240,984 |
| Nellesens | 813,307 | 162,661 |
| Jensens | 239,543 | 47,909 |
| Neffs | 232,438 | 46,487 |
| Loves | 38,582 | 7,716 |

The primary issue for decision is whether petitioners' principal purpose in acquiring stock in their respective S corporations was the evasion or avoidance of Federal income taxes--namely, to obtain the benefit of ordinary loss deductions to which petitioners would not otherwise have been entitled.

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

In these consolidated cases background facts relating to the 12 petitioners are different. However, all petitioners and respondent have stipulated that the relevant and controlling facts on the issues before us are essentially the same and that our factual findings and conclusions herein shall be applicable to each petitioner and to respondent.

Some of the facts have been stipulated and are so found. At the time of filing their petitions, all petitioners resided in Utah.

Hereinafter unless otherwise noted, references to petitioners are to petitioners Mark McKay and Christine A. Beck-McKay.

History and Structure of Business

In the late 1970s petitioners began working as manager-trainees at McDonald's restaurants.

In the late 1980s petitioners purchased interests in several McDonald's restaurants in and around Salt Lake City, Utah, and began operating and managing the restaurants. Initially, petitioners owned the restaurants as partners with McDonald's. After approximately two years petitioners bought out McDonald's ownership interests in the restaurants.

In 1994 petitioners restructured the operation and management of their McDonald's restaurants by forming two Utah regular corporations--one referred to as the operating company, the other as the management company. The operating company, MB Food Service, Inc. (operating company), was responsible for operating the various McDonald's restaurants and for the food inventory and equipment in each restaurant and was obligated to pay the McDonald's franchise fees.[3]

In exchange for fees paid to it by the operating company, the management company, McKay Management, Inc. (management company), employed and paid all of the employees working in the McDonald's restaurants. The management company was responsible for, among other things, hiring, training, and firing the employees; administering employee health care; and maintaining liability insurance relating to operation of the McDonald's restaurants.

Petitioners were equal owners of all of the stock in and the only officers and directors of the operating and management companies.

---

[3]Technical ownership of the McDonald's franchises, as between petitioners and the operating and management companies, is not clear from the record.

In addition to the many individuals who prepared food and took orders, at each restaurant there apparently were one or two managers, two supervisors, and an equipment technician--all employees of the management company.

As owners and officers of the operating and management companies, petitioners of course were ultimately responsible for overall management and operation of the various McDonald's restaurants. Petitioners often would consult key employees with regard to decisions that were made and operational problems that arose.

In 1994 petitioners formed a profit-sharing plan (PSP) for the benefit of the management company employees. Over the years the PSP did not perform as well as petitioners and the employees had expected, with low investment returns and high administrative costs.

In 2002 petitioners concluded that continuation of the PSP was not viable and began investigating an alternative. Petitioners met with a representative from Lincoln Financial Group who recommended that the management company establish an employee stock ownership plan (ESOP) to replace the PSP and to own the stock in the management company. This representative explained that an ESOP could provide a more reliable source of income and benefits for management company employees and would provide an opportunity for

management company employees to obtain ownership interests in the management company.

Petitioners discussed and confirmed with their accounting and legal advisers the advantages of establishing an ESOP. Petitioners were advised that the ESOP-sponsoring management company should be an S corporation and that petitioners could either convert the existing management company into an S corporation or create a new S corporation for that purpose. In particular, income of the management company would pass through to the ESOP as holder of the stock in the management company and would not be taxed because of the tax-exempt status of ESOPs. See secs. 401(a), 501(a).

Petitioners' advisers also suggested that a nonqualified deferred compensation plan could be established within the management company to defer some of the compensation of petitioners and other senior employees of the management company on a tax-favored basis.

Petitioners discussed with other key employees of the operating and management companies termination of the PSP and replacement of the PSP with an ESOP. These individuals agreed with this course of action.

In April 2002 MB Resource Management, Inc., was incorporated (and it made an S corporation election) to serve as the new management company for

petitioners' McDonald's restaurants. Hereinafter, references to the management company refer to MB Resource Management, Inc.

Concurrent with the creation of the new management company, an ESOP was formed to which the stock in the new management company was issued, and petitioners and approximately 275 other employees of the former management company became participants in and beneficiaries of the ESOP.

The financial assets of the PSP were transferred into the ESOP, and the PSP was terminated.

In the spring of 2002 the management company also established and began sponsoring a nonqualified deferred compensation plan (NQDCP) for the benefit of its senior officers and employees.

Petitioners elected to participate in the NQDCP, and in 2002, 2003, and early 2004 a total $3,066,000 of petitioners' management company salaries were deferred under the NQDCP in exchange for the management company's commitment to pay petitioners the deferred compensation in future years. Because of personal financial situations and the need for current funds, no employees of the management company other than petitioners chose to participate in the NQDCP.

Under this new structure, the management company--the stock in which was now owned by the ESOP--continued to receive fees from the operating company relating to the management company employees working in the restaurants.

Because of the large amounts of petitioners' compensation that were deferred under the NQDCP, significant portions of the management company's income for 2002, 2003, and 2004 (consisting of the fees it received from the operating company) reflected the deferred compensation and were not made available for distribution to the ESOP and to the rank-and-file employee-beneficiaries of the ESOP.

Because the management company was taxed under subchapter S of the Code, reported taxable income of the management company flowed through to its sole shareholder--the ESOP. As a tax-exempt entity, however, the ESOP was not taxed on this income.

As a result of the management company's commitment under the NQDCP to pay to petitioners large amounts of deferred compensation, the stock in the management company owned by the ESOP had little value and negatively affected the value of the rank-and-file employees' beneficial interests in the ESOP. As respondent notes, instead of using the ESOP to transfer benefits to the rank-and-file employees of the management company, the combined effect of the new

management structure was to convert a significant portion of the income of the operating and management companies into amounts to be paid by the management company to petitioners as deferred compensation.

Summary of Relevant Statutory and Regulatory Changes Relating to ESOPs

An ESOP is a defined contribution plan designed to allow employees to own stock in corporate employers. An ESOP may be formed as a stock bonus plan or as a stock bonus and a money purchase plan, both of which are qualified as tax-exempt entities under section 401(a). Sec. 4975(e)(7).

Before 1996 ESOPs were prohibited from owning stock in S corporation employers; however, with the passage of the Small Business Job Protection Act of 1996, Pub. L. No. 104-188, sec. 1316(a), 110 Stat. at 1785, Congress changed this rule and, effective January 1, 1998, ESOPs were allowed to own stock in S corporation employers.

In 1997 Congress further amended the rules relating to ESOPs by exempting ESOPs from unrelated business income tax. See Taxpayer Relief Act of 1997, Pub. L. No. 105-34, sec. 1523(a), 111 Stat. at 1070 (adding section 512(e)(3)).

The above relaxed rules relating to ESOPs made available to small business owners significant tax and other advantages, and many small business owners,

including petitioners, established ESOP ownership of their S corporations under these new rules.

Four years later, in 2001, responding to perceived abuses in the use of ESOPs under the above statutory provisions, Congress enacted section 409(p), which in general limits tax benefits available through ESOPs that own S corporations unless the ESOPs actually provide meaningful benefits to rank-and-file employees. See Economic Growth and Tax Relief Reconciliation Act of 2001, Pub. L. No. 107-16, sec. 656, 115 Stat. at 131; see also H.R. Rept. No. 107-51 (Part 1), at 100 (2001) ("[T]ax deferral opportunities provided by an S corporation ESOP should be limited to those situations in which there is broad-based employee coverage under the ESOP and the ESOP benefits rank-and-file employees as well as highly compensated employees".).

Under new section 409(p)(1) through (3), as enacted in 2001, if at any time during an ESOP's plan year all disqualified persons own at least 50% of the deemed-owned shares in the S corporation, a disqualified person may not receive an allocation from the ESOP during the year (often referred to as the nonallocation year) without significant negative tax consequences. Whether an individual is a disqualified person depends on the amount of the individual's deemed-owned shares of stock in the S corporation. Sec. 409(p)(4)(A). An individual will be considered a

disqualified person if:  (1) the total deemed-owned shares of the individual and the members of the individual's family is at least 20% of the number of deemed-owned shares of stock in the S corporation; or (2) the individual is a deemed 10% shareholder.  Id.

For purposes of the above stock ownership tests, Congress included in the definition of deemed stock ownership under section 409(p) certain indirect ownership interests in the S corporation, referred to as "synthetic equity".  See sec. 409(p)(5), (6)(C).

On July 21, 2003, the Commissioner issued temporary regulations under which, for the first time, the definition of synthetic equity under section 409(p)(6)(C) included employee balances under nonqualified deferred compensation plans such as the NQDCP which petitioners had established within the management company.  See sec. 1.409(p)-1T(f)(2)(iv), Temporary Income Tax Regs., 68 Fed. Reg. 42975 (July 21, 2003).  These regulations constitute legislative regulations. See sec. 409(p)(7).

Where the deemed-stock ownership tests of section 409(p) are violated, there are significant consequences to the disqualified persons, to the S corporation, and to the ESOP.  Prohibited allocations in favor of disqualified persons are treated as currently taxable to the disqualified persons, sec. 409(p)(2)(A), and excise taxes

equal to 50% of the total prohibited allocations are imposed on the S corporation, sec. 4979A. Further, the ESOP will not satisfy the requirements of section 4975(e)(7) and will cease to qualify as an ESOP.

The temporary regulations concerning nonqualified deferred compensation and synthetic equity had an effective date of July 21, 2004. See sec. 1.409(p)-1T(h)(1), Temporary Income Tax Regs., 68 Fed. Reg. 42977 (July 21, 2003).

As a result of the above temporary regulations and absent any payout of petitioners' deferred compensation, after July 21, 2004, petitioners' $3,066,000 balance in their NQDCP accounts with the management company would have been treated as synthetic equity under section 409(p)(5) and (6)(C), rendering petitioners disqualified persons and 2004 a nonallocation year. Petitioners would have been required to include in their 2004 income their $3,066,000 balance in the NQDCP, an excise tax equal to 50% of the prohibited allocation would have been imposed on the management company, and the ESOP would have lost its tax-exempt status.

Under the temporary regulations, the $3,066,000 balance in petitioners' NQDCP accounts with the management company could avoid being treated as synthetic equity only if the deferred compensation was paid out on or before July 21, 2004.

Petitioners' Response to the Temporary Regulations

Petitioners sought to avoid the above negative consequences. On January 15, 2004, petitioners' attorneys sent petitioners a letter addressing the new temporary regulations regarding ESOPs, synthetic equity, and deferred compensation. This letter identified what it referred to as three options for petitioners in light of the temporary regulations:

(1) before July 21, 2004, pay out all of the nonqualified deferred compensation allocated to petitioners, terminate the NQDCP, and either (a) terminate the ESOP or (b) continue to use the ESOP for the benefit of the management company employees;

(2) before July 21, 2004, sell the management company stock to petitioners for fair market value, have the management company pay to petitioners the $3,066,000 deferred compensation, and terminate the ESOP;

(3) before July 21, 2004, pay to petitioners a sufficient amount of the nonqualified deferred compensation so petitioners would not be treated as disqualified persons and thereafter continue the ESOP arrangement in compliance with the temporary regulations;

With respect to option (1), petitioners' attorneys state in their January 15 letter: "The simplest response to the * * * [Temporary] Regulations would be to terminate your deferred compensation plan and * * * [pay] out all of the amounts deferred to date." As one advantage to this option (and to continuing use of the ESOP), the letter further states: "Management Company and ESOP could

continue and funds could be accumulated tax-free as retained earnings (but if left as retained earnings, such earnings would benefit * * * all employees)".

After conferring with their accounting and legal advisers and considering the above options, petitioners concluded that compliance with the requirements of the temporary regulations would cause the administration of the management company and the ESOP to be more complicated and costly and less effective than they had anticipated. Also, the high turnover rate of the employees at the McDonald's restaurants had required the ESOP to engage in frequent and costly buybacks from the employees of their beneficial interests in the ESOP. Accordingly, petitioners decided to terminate the NQDCP and the ESOP and to return to a management-company-sponsored profit-sharing plan similar to the PSP petitioners had used from 1994 to 2002. Believing that compliance with the temporary regulations would be difficult and expensive, petitioners rejected option (3). Petitioners ultimately elected option (2) over option (1).

On July 12, 2004, an independent professional valuation firm appraised the stock in the management company at $103,000, a value therefor which respondent does not dispute. This low valuation reflected the management company's total $3,066,000 deferred compensation payment obligation to petitioners.

On July 12, 2004, petitioners for $103,000 (consistent with the above valuation) purchased and acquired from the ESOP all of the S corporation stock in the management company.

On July 13, 2004, petitioners (as new owners of the stock in the management company) ceased benefit allocations to the ESOP, established a profit-sharing plan for the benefit of management company employees, merged the assets of the ESOP into the new profit-sharing plan, and terminated the ESOP.

Between July 15 and 19, 2004, the management company paid out to petitioners the $3,066,000 it owed to them as deferred compensation under the NQDCP.  Petitioners were required to and did recognize the receipt of the $3,066,000 as ordinary income on their 2004 joint Federal income tax return.

Petitioners elected under section 1377(a)(2) to divide the management company's 2004 taxable year into two taxable periods--from January 1 to July 12, 2004, and from July 13 to December 31, 2004.  During the January 1 to July 12, 2004, taxable period, the ESOP was the sole shareholder of the management company.  During the July 13 to December 31, 2004, taxable period, petitioners were the sole shareholders of the management company.

Because the $3,066,000 deferred compensation was paid to petitioners during the second of the above two 2004 taxable periods and because petitioners reported

the $3,066,000 in their 2004 taxable income, the management company became entitled under section 404(a)(5) to a $3,066,000 deduction with respect thereto at a time when petitioners were its sole shareholders (as opposed to when the tax-exempt ESOP had been the sole shareholder).[4]

Largely as a result of the above $3,066,000 deduction, an approximate net operating loss of $2,969,000 was realized and reported by the management company in its second taxable period for 2004. Because the management company was an S corporation, this $2,969,000 ordinary loss deduction flowed through to petitioners, who claimed it on their 2004 joint Federal income tax return. As a result, this $2,969,000 loss deduction offset the tax effect of most of the $3,066,000 deferred compensation petitioners received and included in their 2004 income.

Between July 14 and November 24, 2004, petitioners transferred $2,965,000 to the management company as a capital contribution. Petitioners' capital contribution had the effect of increasing their bases in their stock in the

---

[4]Employees using the cash receipts and disbursements method of accounting are not taxed on deferred compensation until the date on which they actually or constructively receive cash or other benefits under the NQDCP. See sec. 451(a). The employer is entitled to a tax deduction for the nonqualified deferred compensation payment only when that amount is includible in the employees' gross income, even if the employer uses the accrual method of accounting. See sec. 404(a)(5).

management company.[5]  Petitioners also acknowledge aggressive tax planning in connection with this capital contribution (i.e., that their $2,965,000 capital contribution to the management company was made for the purpose of increasing their tax bases in the management company and thereby to take full advantage of the net operating loss deduction discussed above).

On audit respondent determined that petitioners' July 12, 2004, purchase and acquisition from the ESOP of the stock in the management company occurred for the principal purpose of avoiding or evading taxes by obtaining a loss deduction to which petitioners would not otherwise have been entitled, and respondent disallowed under section 269 the approximate loss deduction of $2,969,000 petitioners claimed.[6]  Respondent also determined that petitioners were liable for a section 6662(a) accuracy-related penalty.

---

[5]When petitioners purchased the management company stock from the ESOP, their tax bases therein equaled their stock purchase price of $103,000.  See sec. 1012.  After the $2,965,000 capital contribution to the management company, petitioners' tax bases in their management company stock were approximately equal to the $2,969,000 claimed loss deduction that arose from the management company's payment of the deferred compensation.

[6]On audit, respondent relied alternatively on sec. 482 to reallocate the deferred compensation deduction of $3,066,000 to the tax-exempt ESOP and on sec. 382 to limit to $256,223 the claimed loss deduction.  Respondent has abandoned these alternative theories and now argues solely for the application of sec. 269 to disallow petitioners' $2,969,000 claimed loss deduction.

OPINION

Section 269(a) provides that if a taxpayer acquires control of the stock in a corporation and the principal purpose for the acquisition is the evasion or avoidance of income tax by securing the benefit of a deduction, credit, or other allowance to which the taxpayer would not otherwise be entitled, the Commissioner may disallow the deduction, credit, or other allowance. The term "allowance" refers to anything in the internal revenue laws that has the effect of diminishing tax liability. Sec. 1.269-1(a), Income Tax Regs.

Section 269 applies only if tax evasion or avoidance is the principal purpose for the acquisition. See Capri, Inc. v. Commissioner, 65 T.C. 162, 178 (1975); Plains Petroleum Co. v. Commissioner, T.C. Memo. 1999-241; see also sec. 1.269-3(a), Income Tax Regs. In the context of section 269, "principal purpose" means that the evasion or avoidance purpose must exceed in importance any other purpose. See Capri, Inc. v. Commissioner, 65 T.C. at 178; sec. 1.269-3(a), Income Tax Regs.; see also House Beautiful Homes, Inc. v. Commissioner, 405 F.2d 61, 67 n.18 (10th Cir. 1968), aff'g T.C. Memo. 1967-51. In considering what is the principal purpose, it is appropriate to aggregate all tax avoidance purposes and compare them with the aggregate business purposes for the acquisition. U.S. Shelter Corp. v. United States, 13 Cl. Ct. 606, 619-621 (1987) (citing Bobsee Corp. v. United

States, 411 F.2d 231, 239 (5th Cir. 1969)).  To prevail, petitioners need prove only that the avoidance or evasion of tax was not the principal purpose for the acquisition.  See Capri, Inc. v. Commissioner, 65 T.C. at 178.

The determination of the principal purpose for acquiring control of a corporation is a question of fact that depends upon the intent of those who acquire control.  S. Dredging Corp. v. Commissioner, 54 T.C. 705, 718 (1970).  The test we apply is one of subjective intent, and the testimony of the taxpayers who acquire control is of particular importance.  See Capri, Inc. v. Commissioner, 65 T.C. at 179; D'Arcy-MacManus & Masius, Inc. v. Commissioner, 63 T.C. 440, 450 (1975).

The purpose which is relevant under section 269 is the purpose which existed at the time of the acquisition; however, facts occurring before and after the acquisition may be considered to the extent they tend to support or negate the proscribed purpose.  Inductotherm Indus., Inc. v. Commissioner, T.C. Memo. 1984-281 (citing Hawaiian Trust Co., Ltd. v. United States, 291 F.2d 761, 768 (9th Cir. 1961)), aff'd without published opinion, 770 F.2d 1071 (3d Cir. 1985); see also House Beautiful Homes, Inc. v. Commissioner, 405 F.2d at 66 ("[I]t is only through an analysis of conduct that motivation can be inferred.  Whether the conduct occurs immediately subsequent to * * * [the acquisition] or some time

thereafter, it sheds light upon the original intention of the controlling shareholder.").

The Commissioner's determination is presumptively correct, and the burden is on the taxpayer to show that tax avoidance or evasion was not the principal purpose of the acquisition. See Rule 142(a); H. F. Ramsey Co. v. Commissioner, 43 T.C. 500, 516-517 (1965).

Respondent acknowledges that because S corporations are passthrough entities for Federal income tax purposes and do not keep their own deductions and losses (i.e., S corporation deductions and losses automatically pass through to the shareholders), it is extremely rare that the Commissioner would seek to make a section 269 adjustment in the context of a taxpayer's acquisition of an S corporation.

Petitioners go further and contend that section 269 was never intended to apply to the acquisition of stock in S corporations, that the text of section 269 is incompatible with its application to the acquisition of S corporation stock, and that the absence of relevant authority or precedence supports the conclusion that, as a matter of law, section 269 does not apply to the acquisition of stock in an S corporation.

Petitioners, of course, also argue that the principal purpose for their July 12, 2004, purchase and acquisition of the stock in the management company was to respond to the requirements of the temporary regulations relating to deferred compensation and synthetic equity and to fundamentally alter the management structure of their McDonald's restaurant business.

We agree with petitioners that on the facts before us respondent's section 269 adjustment is misplaced.

Petitioners were entitled to arrange their affairs so as to minimize their tax liability by means which the law permits. See Gregory v. Helvering, 293 U.S. 465 (1935); Davis v. United States, 282 F.2d 623, 627 (10th Cir. 1960). Clearly, the structure of petitioners' McDonald's restaurant business (the operating company, the S corporation management company, the ESOP, and the NQDCP) in place before July 12, 2004, reflected aggressive tax planning. Respondent obviously does not like that structure, but in these consolidated cases respondent has not and does not challenge that structure.

Respondent, however, argues that in response to the temporary regulations under section 409(p), petitioners' purchase of the stock in the management company, termination of the ESOP, payout of the deferred compensation, capital contribution, and claim of the $2,969,000 tax loss deduction went too far.

Respondent emphasizes that petitioners' purchase of the stock in the management company, the election to split the management company's 2004 taxable year, the payout of the deferred compensation, and petitioners' contribution of capital were all integral steps in petitioners' plan of acquisition of the stock in the management company. Respondent cites section 1.269-3(a)(2), Income Tax Regs., which provides in part: "The determination of the purpose for which an acquisition was made requires a scrutiny of the entire circumstances in which the transaction or course of conduct occurred, in connection with the tax result claimed to arise therefrom."

On the evidence before us, we conclude that in July 2004 petitioners had legitimate nontax business reasons for purchasing and acquiring the stock in the management company. Also, the Commissioner's temporary regulations relating to ESOPs and deferred compensation effectively required petitioners to take some action. Petitioners paid out the $3,066,000 in deferred compensation and thereby addressed or avoided the adverse tax consequences that would have been triggered under the temporary regulations.

By 2004 petitioners concluded that the existing management structure they had put in place in 2002 had become more complicated and costly and less effective than they had anticipated. Also, petitioners regarded the temporary regulations as

further complicating the management structure they had put in place. The evidence is clear that for those reasons petitioners eliminated the ESOP ownership of the S corporation management company, acquired the stock therein, terminated the NQDCP, and reverted to the management structure they had used in earlier years. Petitioners' purchase and acquisition of the stock in the management company was a key feature of that management restructuring and did not occur principally for tax avoidance purposes.

Further, the payout of the $3,066,000 in deferred compensation was in direct response to the Commissioner's invitation under the temporary regulations for them and other taxpayers to make such a payout. That payout to petitioners, and petitioners' tax treatment thereof as taxable income in 2004, produced the tax loss deduction for the management company and represented a substantive economic event for both the management company and petitioners.

Further, petitioners' split of the management company's 2004 tax year was appropriate in light of the change in ownership of the management company on July 12, 2004, and was clearly authorized under section 1377(a)(2).

Lastly, petitioners' $2,965,000 capital contribution to the management company was a real economic outlay that under the tax law increased petitioners' tax bases in their stock in the management company. See secs. 351(a), 358(a)(1),

1012.  No evidence indicates, and no claim is made by respondent, that petitioners' $2,965,000 contribution to the management company was temporary or a sham, or anything other than a legitimate contribution of real money to the management company by its shareholders--petitioners herein.  The fact that the $2,965,000 capital contribution to the management company was made with the purpose and objective in mind of increasing petitioners' stock bases in the management company (in anticipation of the flowthrough of the $2,969,000 loss deduction from the management company) does not detract from the economic substance of petitioners' capital contribution; and respondent does not suggest that petitioners' tax bases in their stock in the management company should not be increased by the full $2,965,000.

The above transactions and steps clearly were related and planned as part of an effort to avoid problems created for petitioners by the Commissioner's temporary regulations, to restructure the management company, and to terminate the ESOP;  but they represent valid and real transactions with economic effect that require our recognition as legitimate business transactions.  See Rocco, Inc. v. Commissioner, 72 T.C. 140 (1979) (it was not the taxpayer's acquisition of a corporation that resulted in the tax benefits challenged by the Commissioner, but a combination of other legitimate actions--namely, use of the cash method of

accounting and filing of consolidated returns--that gave rise to those challenged tax benefits); Arwood Corp. v. Commissioner, T.C. Memo. 1971-2 ("It must be remembered that section 269 addresses itself to a situation where the principal purpose of the acquisition is tax avoidance; in the present case only the method selected for effecting the acquisition was motivated to some extent by tax considerations.").

On brief petitioners insightfully state--

By way of illustration only, had petitioners not acquired the Management Company, but instead formed a new S corporation, made a capital contribution of $1 Million to the new S corporation, then paid out $1 Million salary, the tax consequence would have been identical to the result respondent complains of; namely, petitioners would have received $1 Million in taxable salary, offset by a $1 Million loss in the S corporation, passed through because of the $1 Million basis derived from the capital contribution.

Once petitioners' tax bases in the management company stock were established, or increased to approximately $3 million, the loss deduction that flowed through to them from the management company as a result of the management company's deferred compensation payout was automatic. Further, petitioners' claim of the $2,969,000 loss deduction on their 2004 individual Federal income tax return caused a reduction in their tax bases in the management company stock and will

result in increased tax for petitioners if and when they sell their management company stock.

We fail to see how petitioners' aggressive tax planning in establishing the structure for their McDonald's restaurant business and in responding to respondent's temporary regulations under section 409(p) taints under section 269 the July 12, 2004, acquisition by petitioners of the management company stock. See Plains Petroleum Co. v. Commissioner, T.C. Memo. 1999-241. The $2,969,000 loss deduction is based upon the real payout of $3,066,000 (which petitioners reported in income) and on petitioners' tax bases in their management company stock, which bases reflected petitioners' real capital contribution of $2,965,000.

Having decided the factual issue before us in favor of petitioners, we need address neither the legal issue petitioners and respondent raise (whether section 269 ever may be applied to a taxpayer's acquisition of the stock in an S corporation), nor the penalties determined by respondent.

For the reasons stated,

Appropriate orders will be issued in docket Nos. 6000-09 and 6449-09, and decisions will be entered for petitioners in docket Nos. 5999-09, 6290-09, 6303-09, and 12128-09.