T.C. Memo. 2012-244

UNITED STATES TAX COURT

G. STEVEN NEFF AND CARRIE J. NEFF, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

BRADLEY T. JENSEN AND TERRI JENSEN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 6000-09, 6449-09.[1]          Filed August 27, 2012.

<u>Held</u>:  The termination or rollout of equity split-dollar life
insurance arrangements triggered Ps' realization of $710,376 in
compensation income for 2003.

_____

[1]These two consolidated cases were part of a consolidated group of cases that
were the subject of a separate opinion filed June 13, 2012.  <u>See</u> <u>Love v.
Commissioner</u>, T.C. Memo. 2012-166.  In <u>Love</u> we rejected respondent's
adjustment under I.R.C. sec. 269 relating to petitioners' acquisition of an S
corporation.

[*2]   W. Waldan Lloyd, David R. York, and Daniel S. Daines, for petitioners.

Charles B. Burnett and Milan H. Kim, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


SWIFT, Judge:  In these consolidated cases, respondent determined deficiencies of $120,097 and $135,994 in the Neffs' and Jensens' respective Federal income tax for 2003[2] and penalties under section 6662(a).[3]

The primary issue for decision is whether equity split-dollar life insurance arrangements were terminated and whether, when, and to what extent petitioners G. Steven Neff and Bradley T. Jensen are taxable thereon.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time of filing their petitions, petitioners resided in Utah.

---

[2]Respondent has stipulated reductions in his deficiency determinations due to miscalculations made in his notices of deficiency.  Above, we reflect respondent's deficiencies as recalculated by respondent.

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[*3]** Hereinafter, references to petitioners are generally to G. Steven Neff and Bradley T. Jensen.

Since 1979 petitioners each have owned a 50% interest in a Utah regular corporation named Neff & Jensen Construction, Inc. (N & J Construction). N & J Construction has engaged in the business of commercial concrete work. Also, for many years petitioners together and separately have owned and operated a number of other related companies and partnerships.

On February 20, 2002, petitioners formed Neff & Jensen Leasing, Inc., as a Utah subchapter S corporation (N & J Management) to provide management, personnel, and accounting services for a number of related companies and businesses, including N & J Construction. All of the stock in N & J Management was owned by an employee stock ownership plan (ESOP), also formed in February 2002.

Petitioners were the officers of N & J Management. Mr. Jensen was president; Mr. Neff was vice president, treasurer, secretary, and director.

Petitioners were the only trustees of the ESOP.

After formation of N & J Management the employees of N & J Construction and the related companies continued doing the same work but they became employees of N & J Management and participants in the ESOP.

[*4]   During 2002 and 2003 N & J Management made premium payments due on six life insurance policies issued by the Lincoln National Life Insurance Co. covering the lives of petitioners.  The life insurance policies were entered into for business and estate planning purposes--namely, to fund cross-purchase buy-sell stock agreements entered into between petitioners and to provide estate liquidity upon the deaths of petitioners.

N & J Management's agreement to pay premiums due on the six life insurance policies on petitioners' lives was based on and related to the employment relationship they had with and the services they provided for N & J Management.

Technically, the life insurance policies were owned by petitioners and by GSN Investment, Ltd. (GSN) and TerSen, Ltd. (TerSen), family limited partnerships owned by petitioners and immediate family members.  Mr. Steven Neff owned one of the life insurance policies.  Mr. Bradley Jensen owned one of the life insurance policies.  GSN owned two of the life insurance policies, and TerSen owned the other two life insurance policies.  Hereinafter, only limited

[*5] references are made to GSN and TerSen, and references to petitioners occasionally and where appropriate include GSN and TerSen.[4]

The obligation of N & J Management to pay premiums due on the six life insurance policies was part of four equity split-dollar life insurance arrangements (hereinafter sometimes referred to as SDLIA or SDLIAs) that were memorialized in four essentially identical written SDLIA agreements that were entered into on March 6, 2002, between petitioners and N & J Management.

As stated, under the SDLIA agreements formal ownership rights in the six life insurance policies were held by petitioners, not N & J Management. As employer, however, N & J Management agreed and was obligated to pay the premiums due on the life insurance policies, and petitioners agreed that upon either termination of the life insurance policies (such as upon the deaths of petitioners) or upon termination of the SDLIAs for some other reason (such as upon a third-party sale of N & J Management and regardless of whether the life insurance policies were canceled), N & J Management would have the right to be reimbursed an amount equal to the lesser of the total premiums it had paid on the

---

[4]Petitioners Steven and Carrie Neff owned a 2% interest in GSN, and the remaining 98% interest in GSN was owned beneficially by their children. Petitioners Bradley and Terri Jensen owned a 2% interest in TerSen, and the remaining 98% in TerSen was owned beneficially by their children.

**[*6]** six life insurance policies or the total cash surrender value of the policies.

Paragraph (2) of the SDLIA agreements provided in part as follows:

> (b) [N & J Management] shall have no incidents of ownership over the Policies and shall only have the right to collect * * * its interest in the proceeds of the Policies * * * <u>upon</u> the death of * * * [petitioners], <u>termination</u> of this Agreement for any reason whatsoever, or upon the lapse, cancellation, or surrender of the Policies.  [Emphasis added.]

Paragraph (3) of the SDLIA agreements acknowledged that N & J Management's life insurance policy premium payments created "indebtedness" from petitioners to N & J Management.

Paragraph (4) described N & J Management's premium payments as "advances" as follows:

> (4) Policy Interest
>
> > (a)  [N & J Management Company's] Interest
> >
> > > [N & J Management] has the right to receive back an amount equal to the premium <u>advances</u> it has made on the Policies.  [Emphasis added.]

If petitioners died when the SDLIAs and life insurance policies were still in effect, paragraph (6) of the SDLIA agreements provided the obvious--namely, that the life insurance policy proceeds would be paid "after the death of * * * [petitioners]."

**[*7]** Paragraph (7)(a) added that if the life insurance policies were terminated or canceled before the deaths of petitioners, N & J Management was to receive reimbursement of the policy premiums it had paid out of the cash value of the policies (death policy proceeds not yet being available).

Apart from the life insurance policies covering the lives of petitioners and regardless of whether the policies remained in effect, the SDLIA agreements provided that the SDLIAs themselves could be terminated by agreement of petitioners and N & J Management. Paragraph (8) provided as follows:

(8) Termination of Agreement

This Agreement shall terminate for any of the following reasons:

(a) Performance of its terms following the death of the Insured;

(b) Written agreement of all of the parties hereto specifically terminating this Agreement.

The SDLIA agreements did not state that the parties to the agreement (namely, petitioners and N & J Management) could not terminate the agreement by mutual oral agreement.

Paragraph (9) of the SDLIA agreements reiterated that in the event of a termination of the SDLIAs other than by the deaths of petitioners reimbursement

**[*8]** to N & J Management of the policy premiums it had paid would be made out of the cash values of the insurance policies.

Paragraph (10) of the SDLIA agreements expressly provided that N & J Management's interest in the policies could be either "satisfied" (by full reimbursement of premiums paid ) or "released" by N & J Management.

Under paragraph 3(b) of written collateral assignment agreements relating to the SDLIA agreements that petitioners executed, death benefits from the six life insurance policies and the cash surrender value thereof were pledged in favor of N & J Management to provide security for N & J Management's premium reimbursement rights and petitioners' "liabilities * * * to [N & J Management] for premium advances" N & J Management had made.

Paragraph 5(c) of the collateral assignment agreements stated that N & J Management had the right to reimbursement of the premiums it paid "in the event of termination" of the SDLIAs.

Nothing in the SDLIA agreements and the collateral assignment agreements suggests that--upon termination of the SDLIAs for reasons other than the deaths of petitioners--reimbursement to N & J Management of the premiums it paid on the policies would be put off until the deaths of petitioners and receipt of the life insurance proceeds.

**[*9]**     As beneficiaries, petitioners (and their heirs) retained the right to access cash values and to receive proceeds of the life insurance policies but only to the extent they exceeded premium reimbursements owed and paid to N & J Management.

The cash surrender value of the six life insurance policies increased with the passage of time and as the premiums paid were invested by the insurance company.

Under the life insurance policies and the SDLIAs from March 2002 through the end of December 2003 a total of $842,345 in premiums on the six policies was paid by N & J Management to the Lincoln Life Insurance Co. As of December 31, 2003, the total cash surrender value of the policies was $877,432.

Because of a new regulatory scheme the Commissioner adopted in 2002 for split-dollar life insurance arrangements (explained more fully below), in late 2003 and on advice of counsel petitioners decided to terminate the SDLIAs. In December 2003 by agreement of petitioners and N & J Management the four SDLIA arrangements between petitioners and N & J Management relating to the six life insurance policies were terminated.[5]

---

[5]The precise date in December 2003 on which the SDLIA arrangements were terminated is not established in the record.

[*10] After December 2003 N & J Management made no further payments on the six life insurance policies. N & J Management released its interest in the policies (namely, its premium reimbursement rights) with respect to which N & J Management in less than two years had paid $842,345 in premiums.

Upon termination of the SDLIA arrangements in December 2003 N & J Management had fixed rights to receive reimbursement of $842,345 (the lesser of the total premiums paid or the total cash surrender value of the policies). This $842,345 represented the total premium "advances" N & J Management had made on the life insurance policies and petitioners' total indebtedness to N & J Management with regard thereto.

At the request of petitioners' counsel, individuals at petitioners' accounting firm calculated what they regarded as the "December 2003" fair market value of N & J Management's rights to be reimbursed the $842,345 premiums paid. However, apparently on advice of petitioners' counsel, the individuals at petitioners' accounting firm treated N & J Management's reimbursement rights as the right to be reimbursed the $842,345 only upon the deaths of petitioners. The accounting firm applied a present value discount for the $842,345--using an

[*11] assumed life expectancy for each petitioner of 85 and an interest rate of 6%.[6] Petitioners' advisers calculated the December 2003 present value of N & J Management's $842,345 reimbursement rights at $131,969.

In December 2003 petitioners and N & J Management agreed that N & J Management would be reimbursed only the $131,969, as calculated above, and N & J Management agreed to release its interests in the present cash surrender value of the policies, future death benefits from the policies, and petitioners from any reimbursement obligation to N & J Management with regard to the $710,376 balance of the premiums N & J Management paid on the life insurance policies.[7]

On the basis of the above agreement and calculation, on January 11 and 12, 2004, petitioners wrote personal checks totaling $131,969 in favor of N & J Management. The checks were deposited into N & J Management's bank account on January 13, 2004.

Funding for the $131,969 petitioners paid to N & J Management came from their draw on the accumulated cash value of the six underlying life insurance policies.

---

[6]On December 31, 2003, each petitioner was 51.

[7]Total premiums paid of $842,345 less $131,969 reimbursed equals $710,376.

**[*12]** As between petitioners and N & J Management, as of the end of December 2003 N & J Management was treated as having no obligation to make additional premium payments on the six life insurance policies and the SDLIA arrangements were treated as having been released, ended, or terminated. Upon the above termination of the SDLIA arrangements, petitioners had sole rights to the remaining $745,463 balance in the cash surrender value of the life insurance policies.[8]

Apparently, no contemporaneous documentation exists (or was offered into evidence) relating to the December 2003 agreement between petitioners and N & J Management that ended or terminated the SDLIA arrangements. No written termination letter or agreement between petitioners and N & J Management with regard to the SDLIAs was offered into evidence. No written contract of any kind was offered into evidence relating to the above December 2003 agreement to end the SDLIAs. Further, no contemporaneous documentation refers to a sale by N & J Management to petitioners of "contract rights".

---

[8]Total cash surrender value of $877,432 less $131,969 received equals $745,463.

[*13] After December 2003 the six life insurance policies insuring petitioners' lives apparently remained in effect, and petitioners individually apparently made premium payments due thereon.

The evidence in these cases does not indicate that (during the short life of the SDLIA--March 2002 through December 2003) petitioners for 2002 and 2003, as well as for 2004, included in their taxable income any amount relating to the life insurance premiums N & J Management paid, the value of the policies, the dividends, the paid-up additions, or any other amount or value.[9]

Further, on the basis of their advisers' $131,969 present value calculation of N & J Management's premium reimbursement rights under the SDLIAs, petitioners did not report on their respective Federal income tax returns for 2003 or 2004 any income regarding the $710,376 difference between the $131,969 petitioners reimbursed N & J Management and the $842,345 N & J Management paid in premiums on the policies.

On audit respondent determined that in December 2003 on termination of the SDLIA arrangements petitioners realized taxable compensation income of

---

[9]If petitioners for 2002 or 2003 had reported any taxable income relating to the economic benefits of the SDLIAs and the insurance policies, they could have asserted and would have been entitled to a reduction in respondent's adjustments herein for their resulting tax bases therein.

**[\*14]** $710,376, the difference between what they reimbursed N & J Management and what N & J Management paid in premiums on the policies.

In spite of the four life insurance policies owned by GSN and TerSen and the SDLIAs relating thereto, respondent did not make any reduction in the income charged to petitioners, did not charge any income to GSN or TerSen, and did not issue notices of deficiency to GSN or TerSen. The $710,376 in compensation income respondent determined was charged to and allocated solely to and between Mr. Steven Neff and Mr. Bradley Jensen.

In letters to respondent's revenue agent of July 27 and November 15, 2007, in their petition, and in their opening statement at trial, petitioners' counsel described the transaction before us as involving a "termination" of the SDLIAs.

Through audit and up until the time of trial petitioners and their attorneys, accountants, and experts, as well as respondent, treated the transaction before us as occurring in December 2003.

On February 17, 2011, petitioners' accounting firm provided a written calculation or report of N & J Management's premium reimbursement rights. Again apparently on advice of counsel, this written calculation treated N & J Management's reimbursement rights as not effective until the death of each petitioner some 30 years after December 2003.

[*15] The above calculation that the accounting firm prepared for petitioners in February 2011 described what happened to the SDLIAs and the timing thereof, as follows:

> In December 2003, as a result of split-dollar tax regulations and the proposed section 409(p) regulations * * * the plan was ended. [Emphasis added.]

Not until trial herein (which occurred on September 6, 2011) did petitioners' counsel raise the argument and take the position that because petitioners' premium reimbursement checks to N & J Management were not executed by them and not cashed by N & J Management until January 2004, if any compensation income is to be charged to them it should be charged for 2004, not 2003, and that any effort by respondent now to move the income to 2004 would be untimely and should not be allowed.

Petitioners' counsel states that not until just before trial did he review the bank records and realize that petitioners' reimbursement payments occurred in 2004, as follows:

> The exact date of the Transactions was not known to petitioners' counsel until just prior to the trial date on September 6, 2011, when petitioners' counsel was able to obtain and review from the bank copies of the cancelled checks that * * * [petitioners] * * * used to pay the management Company.

**[*16]** No explanation is provided as to why petitioners' counsel was not able to obtain and review the 2004 bank records and canceled checks before September 2011.

## OPINION

In the life insurance industry, the term "rollout" is used to describe termination of an SDLIA other than by death of the insured employee that results in cancellation of the employer's premium payment obligation relating to the life insurance policy and that leaves the insured employee as the sole owner and interest holder in the policy.

When a rollout of an SDLIA occurs, the employer generally is entitled to be reimbursed by the insured employee or owner of the insurance policy the lesser of the total premiums the employer paid on the related life insurance policy or the cash surrender value of the policy at the time of the rollout.

Exit strategies from SDLIAs have been described as follows:

> Split-dollar exit strategies traditionally are known as "roll-out" spilt-dollar arrangements--perhaps better described as an unwinding of the split-dollar arrangement during the insured's lifetime, or a release of the employer's interest in the policy under the arrangement during the insured's lifetime. These strategies contemplate termination of the arrangement by a transfer of the policy or a release of the employer's interest in the policy to the insured or to a third-party owner sometime during the insured's lifetime, <u>after repayment to the corporation of its "interest" in the policy</u>. Normally, repayment is accomplished by

[*17] having the policy owner withdraw from or borrow against the policy to generate the cash needed to repay the employer, which cannibalizes the policy.  * * * Withdrawals for collateral assignment arrangements are tax-free only up to the owner's basis--i.e., the contributed or taxed economic benefit amounts * * * [Lawrence Brody, et al., Insurance-Related Compensation, 386-4th Tax Mgmt. (BNA), at A-118-A-119 (2009).]

Over the years the Commissioner provided little and somewhat confusing administrative guidance on the income tax treatment to corporate executives of the economic benefits associated with SDLIA arrangements.  See, e.g., Rev. Rul. 55-713, 1955-2 C.B. 23; Rev. Rul. 64-328, 1964-2 C.B. 11; Rev. Rul. 66-110, 1966-1 C.B. 12; IRS Notice 2001-10, 2001-1 C.B. 459.

In 2002 and 2003, as SDLIAs became popular, the Commissioner issued a number of additional rulings, notices, and proposed regulations.  See Rev. Rul. 2003-105, 2003-2 C.B. 696; IRS Notice 2002-8, 2002-1 C.B. 398; secs. 1.61-22, 1.7872-15, Proposed Income Tax Regs., 67 Fed. Reg. 45414 (July 9, 2002), published as final Income Tax Regs., 68 Fed. Reg. 54344 (Sept. 17, 2003).

On September 17, 2003, the Commissioner issued final regulations clarifying and changing how taxpayers prospectively should account annually for their incremental gain in equity SDLIAs.  See sec. 1.61-22(d)(2), Income Tax Regs. These final regulations, however, were made inapplicable to SDLIAs

[*18] entered into on or before September 17, 2003, and not materially modified thereafter.  See sec. 1.61-22(j), Income Tax Regs.

Because the SDLIAs in these cases were entered into on March 6, 2002, and were not substantially modified before termination, the Commissioner's final regulations do not apply.[10]  Instead, Rev. Ruls. 64-328 and 66-110, supra, and IRS Notice 2002-8, supra, apply to the SDLIAs involved in these cases (i.e., those entered into after January 27, 2002, but on or before September 17, 2003).  Thereunder, for each year an SDLIA was in effect, an employee was required to include in taxable income the total value or cost of the economic benefit received each year by the employee, less any amount contributed by the employee.  As indicated, petitioners did not include in their taxable income any amount with regard to the economic benefits they received in 2002, 2003, or 2004 with regard to the SDLIAs.

Petitioners now contend that no termination or rollout of the SDLIAs occurred, that they purchased from N & J Management for a discounted present value only "contract rights," that they paid fair value therefor, that the SDLIAs

---

[10]Respondent has chosen not to treat the December 2003 transaction involved herein as a modification of the SDLIAs.

[*19] remain in effect, that they were not released from any indebtedness, and that they realized no compensation income relating thereto.

To the contrary, we believe it obvious that a cancellation, an unwinding, a release, or a rollout of N & J Management's interests in the SDLIAs occurred. The formal SDLIA agreements may not have been technically or formally terminated by a written document, but as of the end of December 2003, the SDLIA arrangements were unwound, and N & J Management was released from its obligation as employer to provide further funding on the life insurance policies. Petitioners have stipulated that after and as a result of the transaction at issue in these cases, N & J Management had no continuing interest or reimbursement rights with regard to the underlying life insurance policies.

We find that the transaction before us constituted an effective rollout of the SDLIAs and that the equity split-dollar life insurance arrangements were terminated during December 2003, even in the absence of a formal written termination of the SDLIA agreements.

No evidence before us (other than the absence of formal written termination documents) suggests that the SDLIAs had any existence beyond December 2003. Petitioners' own advisers treated the transaction before us as a termination of the

**[*20]** SDLIAs and as occurring in December 2003, as did petitioners and petitioners' counsel.

In December 2003 N & J Management was entitled to reimbursement of the $842,345 in premiums N & J Management had paid. Petitioners were obligated or indebted to N & J Management to make the reimbursement, and the cash value of the policies was secured in favor of N & J Management to fund the reimbursement.

N & J Management, however, was reimbursed by petitioners only $131,969, and the $710,376 difference was effectively realized by petitioners (not including GSN and TerSen) as compensation income--namely, petitioners realized the economic benefit of the $710,376 in premiums N & J Management had paid to the life insurance companies on petitioners' behalf and that no longer was encumbered by the reimbursement rights of N & J Management.

The above-cited BNA Tax Management portfolio provides the following additional explanation:

> Under Notices 2001-10 and 2002-8, a policy rollout of an arrangement entered into before the effective date of the final regulations has income tax consequences for the employee if there is any policy equity at that point.

> \*　　\*　　\*　　\*　　\*　　\*　　\*

**[*21]** It is unclear whether repaying the * * * [employer] for its advances on rollout with either a paid-up policy with a face amount (but no current cash value) equal to its interest in the policy or a discounted amount of cash, based on the likely repayment at the insured's death, would be enough to stop the ongoing economic benefit of the arrangement to the employee.

Given the rationale of Rev. Rul. 64-328, neither action may work because they do not appear to repay the employer's "investment" in the policy; if either action did work to stop the ongoing economic benefit of the arrangement, the "shortfall" likely would be taxed to the employee at rollout as some sort of compensation-related debt forgiveness. [Brody, et al., supra, at A-119-A-120.]

Section 61 provides that gross income includes all income from whatever source derived. Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). Generally, an employee who receives an economic benefit under an arrangement with an employer must include in gross income the value of the benefit received. Commissioner v. Smith, 324 U.S. 177, 181 (1945). Under section 1.61-2(d), Income Tax Regs., premiums paid by an employer for life insurance on the life of an employee are treated as taxable income to the employee if the life insurance proceeds are payable to the employee or a beneficiary designated by the employee.

Section 61(a)(12) provides generally that gross income includes income from discharge or release of indebtedness. See United States v. Kirby Lumber Co., 284 U.S. 1 (1931). However, section 61(a)(12) does not apply if a

**[*22]** cancellation or release of indebtedness is simply the medium for payment of some other form of income such as compensation for services being paid by an employer to an employee.

> [C]ancellation of indebtedness can be simply the <u>medium</u> through which other types of income arise. For example, if an employee owes his employer $100 and renders $100 worth of services for the employer in return for the employer's cancellation of the indebtedness, the employee has received personal service income of $100. Sec. 61(a)(1). That income is not cancellation of indebtedness income because the cancellation is merely the medium for payment of other income, and is not the source of the income itself. * * * [<u>Spartan Petroleum Co. v. United States</u>, 437 F. Supp. 733, 736 (D.S.C. 1977).]

See also <u>OKC Corp. v. Commissioner</u>, 82 T.C. 638, 649-650 (1984).

Under section 83(a) and the regulations thereunder, when property is transferred in connection with the performance of services, the excess of the fair market value of the property over the amount paid for the property is to be included in the gross income of the person who performed the services in the first taxable year in which the rights of that person are transferable or not subject to a substantial risk of forfeiture.

Under section 1.83-3(a), Income Tax Regs., a transfer of property occurs when a person acquires a beneficial ownership interest in the property. Under section 1.83-3(e), Income Tax Regs., in the case of a life insurance contract which

**[\*23]** was part of a split-dollar arrangement entered into on or before September 17, 2003, and not materially modified after that date, the cash surrender value of the contract is considered property.

In December 2003 upon rollout of the SDLIAs, the income petitioners realized under section 61 or alternatively the taxable value of property transferred to them under section 83 was the $710,376 difference between the $842,345 that N & J Management paid in premiums on their behalf and that was owed by them and the $131,969 they reimbursed N & J Management. Clearly, petitioners realized an accession to wealth of $710,376 for the additional premiums N & J Management paid. This occurred in the context of and related to petitioners' employment with N & J Management, and the $710,376 constitutes compensation income to them.

Following the termination of the SDLIA arrangements, petitioners had no risk of forfeiture of the economic benefit of the $710,376 not reimbursed to N & J Management. Petitioners had complete ownership of the policies and were free to transfer the cash value of the polices free of encumbrances. Petitioners had no service requirements or other employment-related conditions that they needed to fulfill with regard thereto. See sec. 1.83-3(c) and (d), Income Tax Regs.

[*24] We reject petitioners' vigorous and well-intentioned efforts, through counsel, to cast the transactions before us as a mere sale of "contract rights" at fair value. Their actions, their conduct, their understanding, and their representations among themselves and to respondent consistently treated the transactions as a termination of the SDLIAs.

There is no credible evidence that the focus by petitioners and by their attorneys was on the purchase by petitioners of mere contract rights. Indeed, the calculation by petitioners' accountants does not even talk about or mention contract rights; rather, it addresses and attempts to value N & J Management's reimbursement rights under the SDLIAs that were triggered by termination of the SDLIAs.

Alternatively, petitioners contend that at most "a freeze" of the SDLIAs occurred and that the SDLIAs remained in effect. In making this argument, petitioners seem to forget that N & J Management was paid $131,969 and that the parties regarded and treated as ended or terminated, and in fact ended or terminated, the SDLIA arrangements, with N & J Management retaining no further interest in or claim on the policies and with petitioners owing nothing further to N & J Management with regard thereto. We reject petitioners' argument that a mere freeze of the SDLIAs occurred.

**[\*25]** Petitioners contend that no property was transferred to them that could be taxed under section 83(a). Petitioners focus on their preexisting ownership interests in the life insurance policies and argue that no additional property was transferred to them when N & J Management received the $131,969 payment, was relieved of its obligation to make additional premium payments, and released its rights to reimbursement of the additional premiums it had paid. We disagree.

Petitioners did own the policies, but the total $842,345 in premiums paid by N & J Management and the cash surrender value thereof (namely, $877,432) were encumbered by N & J Management's reimbursement rights and petitioners' indebtedness with regard thereto. Petitioners could not access the cash surrender value and could not sell or dispose of or otherwise transfer their ownership interests in the policies or access the cash surrender value until N & J Management was either reimbursed the $842,345 or gave up its reimbursement rights. N & J Management gave up its reimbursement rights to the $710,376 balance and released petitioners from any further indebtedness on the amount not reimbursed. In essence, the economic benefit of the $710,376 was transferred to petitioners in December 2003 when the SDLIA arrangements were terminated, when N & J Management gave up its additional reimbursement rights, and when

[*26] N & J Management was removed from the picture relating to the life insurance policies. These facts are not changed by the possibility that future premiums to be paid on the life insurance policies, if paid by N & J Management, might trigger a revival of the SDLIA arrangement with regard to future premiums paid.

If we sustain respondent's deficiency determinations against petitioners on the merits, as we do, petitioners make a number of procedural arguments that we briefly address. Petitioners contend that respondent's notices of deficiency were vague and inadequate because they did not reference a specific Code section in support of the determination to treat the $710,376 as compensation income to petitioners. On the facts of these cases, we believe respondent's brief explanation in the notices of deficiency (namely, "compensation income") was sufficient to give petitioners notice of the income adjustments at issue herein.

Petitioners contend that respondent's audit adjustments should have been made for 2004, not 2003, because they paid the $131,969 to N & J Management in 2004. We disagree. Regardless of when petitioners paid the $131,969, the $710,376 not paid by petitioners and with respect to which petitioners had no further obligation to make repayment was realized as income by petitioners in December 2003 when the SDLIA arrangements were terminated and petitioners

[*27] realized the value of the $842,345 (reduced by the $131,969 to be paid by petitioners).[11] As we have held, the evidence is clear that the release by N & J Management of its reimbursement rights, the termination of the SDLIAs, and the vesting in petitioners of full and unrestricted rights to the $710,376 occurred in December 2003.

The fact that the $131,969 petitioners paid N & J Management was not transferred into N & J Management's bank account until January 13, 2004, does not move the realization by petitioners of the $710,376 into 2004. In December 2003, when the rollout was agreed to, when the rollout took effect, when N & J Management was released of its obligation to further fund the policies, and when N & J Management agreed to be reimbursed only $131,969, petitioners realized the economic benefit of the $710,376 that N & J Management paid as premiums on their behalf.

---

[11]We also note that petitioners' 2004 tax year is still open because of audit adjustments respondent made against them for 2004 that remain pending in this Court.

Further, if 2004 were now a closed year for petitioners and if we were to determine that 2004 were the correct year to charge petitioners with the income in dispute, it would appear that respondent would be allowed to open up petitioners' 2004 tax years for the appropriate income adjustments under the mitigation provisions of the Code. See secs. 1311-1314, particularly sec. 1312(3)(B).

[*28] Petitioners contend that the income adjustments regarding the $710,376 should have been charged not just to them but also to GSN and TerSen, the family limited partnerships that owned four of the life insurance policies. Again, we disagree with petitioners. Mr. Steven Neff and Mr. Bradley Jensen were the employees of N & J Management. Their employment relationship with N & J Management was the raison d'être for the SDLIAs. N & J Management paid the premiums on the life insurance policies as part of a compensation package relating to the services of Mr. Steven Neff and Mr. Bradley Jensen.

GSN and TerSen had no employment relationship with N & J Management. GSN and TerSen were simply the designees of petitioners. Any income relating to the premiums N & J Management paid on behalf of petitioners and to the SDLIAs is properly charged to petitioners, not to their family limited partnerships. As explained in Rev. Rul. 78-420, 1978-2 C.B. 67, in the context of SDLIAs, premiums an employer pays on a policy covering the life of an employee are to be included in the income of the employee, regardless of whom the employee designates as owner of the policy.

Other arguments made by petitioners and not specifically discussed herein have been considered and rejected.

**[\*29]** In light of the complex nature of the transaction before us, the difficult tax issues presented, and the testimony and trial record before us, we exercise our discretion not to sustain the section 6662(a) penalties respondent determined. See Nelson v. Commissioner, 130 T.C. 70, 78-79 (2008), aff'd, 568 F.3d 662 (8th Cir. 2009). We believe petitioners acted with reasonable cause and in good faith in relying on their professional tax advisers in omitting from their 2003 income the difference between the amount petitioners paid to N & J Management and the amount N & J Management paid on the six life insurance policies. See sec. 6664(c)(1).

For the reasons stated,

Decisions will be entered under Rule 155.